**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHRISTINE EARL,
            *Plaintiff-Appellant,*

v.

NIELSEN MEDIA RESEARCH, INC.;
VNU USA, INC., FKA The
Nielsen Company (US), Inc.,
            *Defendants-Appellees.*

No. 09-17477

D.C. No.
2:08-cv-00050-
FCD-KJM

OPINION

Appeal from the United States District Court
for the Eastern District of California
Frank C. Damrell, Senior District Judge, Presiding

Argued and Submitted
March 18, 2011—San Francisco, California

Filed September 26, 2011

Before: Procter Hug, Jr., Thomas M. Reavley,* and
William A. Fletcher, Circuit Judges.

Opinion by Judge William A. Fletcher

---

*The Honorable Thomas M. Reavley, Senior Circuit Judge for the Fifth
Circuit, sitting by designation.

## COUNSEL

Deborah Kochan and Matthew Stephenson, KOCHAN & STEPHENSON, San Francisco, California, for the plaintiff-appellant.

Matthew J. Ruggles and Adrianne B. Samms, LITTLER MENDELSON PC, Sacramento, California, for the defendant-appellee.

## OPINION

W. FLETCHER, Circuit Judge:

Plaintiff Christine Earl appeals the district court's grant of summary judgment on her age and disability discrimination and wrongful termination claims under California law against defendant employer Nielsen Media Research, Inc. ("Nielsen"). Viewing the evidence in the light most favorable to Earl, reasonable jurors could find that Nielsen's proffered reason for terminating Earl's employment was a pretext for age discrimination. We therefore reverse the district court's grant of summary judgment against Earl on her age discrimination and wrongful termination claims. We affirm summary judgment against Earl on her disability discrimination claim.

### I.   Background

Plaintiff Christine Earl worked more than a dozen years as a Membership Representative, or "recruiter," for Nielsen in

Northern California. Nielsen measures television program audiences and provides the results to advertisers and media outlets. Earl's job was to recruit households with specified demographics and obtain their consent to install devices relaying their viewing habits back to Nielsen. Nielsen hired Earl in 1994 at age 47.

Earl's difficulties at work began in August 2005, when she violated a Nielsen policy forbidding recruiters from leaving gifts at unoccupied households. After receiving a verbal warning from her supervisor and a company-wide email to all recruiters reiterating the gift policy, Earl violated the rule again in January 2006. The next month, during an assignment in New York, Earl violated a different Nielsen policy requiring recruiters to keep a company map with them while recruiting targeted households. When a supervisor asked her how she signed a home without the map, Earl replied: "Magic?" As a result of these violations, Nielsen placed Earl on a Developmental Improvement Plan ("DIP") in February 2006.

A DIP is an informal, nondisciplinary tool that Nielsen uses to notify an employee that his or her performance fell below company standards. A DIP is distinct from a Performance Improvement Plan ("PIP"), which is part of Nielsen's disciplinary process. Whereas Earl's DIP stated that her failure to meet company expectations in the future "may result in the implementation of the disciplinary process," a PIP states that failure to meet expectations "may result in further disciplinary action up to and including termination." At no point during her time at Nielsen did Earl receive a PIP.

Earl's supervisor, Sally Dollard, prepared her annual "Individual Contributor Performance Planning & Review" for the period between September 1, 2005, and August 31, 2006. Dollard wrote, "Christine ended the year with a sign average of 1.7. Her basic rate was an outstanding 72%." Dollard also noted that Earl had been issued a DIP and noted the reasons for its issuance. In the summary section at the end of the

Review, labeled "Key Strengths and Areas for Improvement," Dollard wrote: "Christine's strength is with signing home[s] and the areas in need of improvement are listed below: Entering contact notes within 24 hours[.] Submitting expense books accurately[.] Ensuring that she always follows policy and procedure." Dollard concluded, "Overall Christine had a good year with her production and she is always consistent with signing homes."

In September 2006, Earl was diagnosed with peripheral neuropathy. She told others at Nielsen, including her supervisor Dollard, that she was suffering from the condition. In her deposition, she described it as follows: "[M]y feet hurt because . . . the nerves are dying, so the secondary nerves take over and the only thing they register — heat, cold and pressure register as pain, so they always hurt. And the more I walk on them the more they hurt." Earl told the others that peripheral neuropathy was hereditary, and that as she got older the condition would get progressively worse. She told everyone, including Dollard, that her father had the same condition: "[M]y dad had no feeling up to his thighs. Although he could walk, he just couldn't feel anything. So it's definitely a progressive thing, so I told people that."

In October 2006, while on an assignment in Texas, Earl obtained the consent of a household with the proper demographics (319 Lake Forest Drive) but mistakenly wrote down the address of a different home (327 Lake Forest Drive) on the form signed by the homeowner. Neither she nor the homeowner noticed the mistake. Earl later entered the address of the wrong house in the Nielsen computer system. In doing so, Earl violated company policy requiring her to verify the home address during the recruitment process and before entering it into the system. The next month, when a Nielsen technician arrived at 327 Lake Forest Drive to install the monitoring device, the owner objected. The technician then located 319 Lake Forest Drive two doors down the street and successfully

installed the equipment there. Nielsen learned of Earl's mistake in December 2006.

Nielsen terminated Earl's employment in January 2007. She was 59 years old. In the months before and after Earl's termination, Nielsen hired five new recruiters for her region: four in their 20s, and one in his early 30s. One of the new recruiters filled the position vacated by Earl. Nielsen paid the newly hired recruiters a salary less than half Earl's salary.

In October 2007, Earl brought suit against Nielsen in California Superior Court, alleging age and disability discrimination under the California Fair Employment and Housing Act ("FEHA"), as well as wrongful termination in violation of public policy. Nielsen removed the case to federal court based on diversity. In September 2009, the district court granted summary judgment in favor of Nielsen on Earl's age discrimination claim. The court found that Earl had established a prima facie case of age discrimination but had failed to produce sufficient evidence to allow a reasonable jury to conclude that Nielsen's proffered nondiscriminatory reason for her termination was pretextual. The court also granted summary judgment in favor of Nielsen on Earl's claims of disability discrimination and wrongful termination.

Earl timely appealed.

## II.    Standard of Review

We review the district court's grant of summary judgment *de novo*, construing the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Noyes v. Kelley Servs.*, 488 F.3d 1163, 1166 n.1, 1167 (9th Cir. 2007). We consider whether a genuine dispute of material fact exists and whether the district court correctly applied the relevant substantive law. *Id.* at 1167-68. "[S]ummary judgment should be used prudently in [age discrimination] cases involving motivation and intent." *Coleman*

*v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000). "We require very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry — one that is most appropriately conducted by the factfinder, upon a full record." *Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1564 (9th Cir. 1994) (citations and internal quotation marks omitted).

## III. Discussion

### A. Age Discrimination

[1] FEHA prohibits employers from discharging or dismissing any employee over 40 years old based on the employee's age. CAL. GOV'T CODE §§ 12926(b), 12940(a). Because state and federal employment discrimination laws are similar, California courts look to federal precedent when interpreting FEHA. *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 354 (2000). In particular, California courts use the familiar *McDonnell Douglas* burden-shifting test when analyzing disparate treatment claims under FEHA. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

[2] Under the three-part *McDonnell Douglas* test, the plaintiff bears the initial burden of establishing a prima facie case of employment discrimination. *Noyes*, 488 F.3d at 1168. Once the plaintiff has done so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If the employer articulates a legitimate reason, the plaintiff must raise a triable issue that the employer's proffered reason is pretext for unlawful discrimination. *Id.* The ultimate burden of persuasion remains with the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

The district court found that Earl established a prima facie case of age discrimination because (1) she was over age 40

and thus a member of a protected class; (2) she suffered an adverse employment action; (3) she received a satisfactory performance evaluation only months before her termination; and (4) she lost her job to a substantially younger employee. The district court also found that Nielsen articulated a legitimate, nondiscriminatory reason for Earl's termination by pointing to her multiple violations of company policy. The "central dispute" on appeal is whether Earl presented sufficient evidence to raise a triable issue of pretext and thereby avoid summary judgment. *Noyes*, 488 F.3d at 1168.

A plaintiff may demonstrate pretext in either of two ways: (1) directly, by showing that unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable. *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000). Earl has not presented direct evidence of discrimination, such as comments from supervisors betraying bias or animus against older workers. Instead, she relies on circumstantial evidence to attack Nielsen's proffered reason.

Where evidence of pretext is circumstantial, rather than direct, the plaintiff must produce "specific" and "substantial" facts to create a triable issue of pretext. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998). *But see Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029-31 (9th Cir. 2006) (questioning the continued viability of *Godwin* after *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003)). That standard is "tempered" by our observation that a plaintiff's burden to raise a triable issue of pretext is "hardly an onerous one." *Noyes*, 488 F.3d at 1170 (quoting *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997)).

Earl argues that Nielsen's explanation for her termination lacks credibility for four reasons: (1) Nielsen treated younger, similarly situated employees more favorably; (2) in terminat-

ing her without first issuing her a PIP, Nielsen deviated from its normal disciplinary procedure; (3) Nielsen offered shifting explanations for her termination; and (4) statistical evidence demonstrated that Nielsen discriminated in its hiring based on age. We focus on the first two arguments and conclude that Earl has raised a triable issue of pretext.

### 1.    Similarly Situated Employees

**[3]** A plaintiff may raise a triable issue of pretext through comparative evidence that the employer treated younger but otherwise similarly situated employees more favorably than the plaintiff. *See Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003); *see also McDonnell Douglas*, 411 U.S. at 804 ("Especially relevant to [a showing of pretext] would be evidence that white employees involved in acts against [the employer] of comparable seriousness . . . were nevertheless retained or rehired."). Here, Earl presented evidence that, during the relevant time frame, Nielsen did not terminate — and in one instance may not have even disciplined — younger "recruiters" in their 30s and 40s when those recruiters repeatedly violated similar Nielsen policies. Nielsen has identified the employees by number rather than by name.

Employee 33071 received a DIP in September 2005 for inadequate maintenance of company assets. In May 2006, she recruited and signed a home that did not have cable television and thus did not fall within Nielsen's required demographics. Employee 33071 received a second DIP for this violation. In December 2006, she failed to verify the address of a home she recruited and either received a PIP or suffered no disciplinary consequence at all.[1] Nielsen did not terminate her. Employee

---

[1] A Nielsen official testified in a deposition that employee 33071 did not receive any discipline for this violation, but a company email indicates she may have received a PIP. In her brief, Earl states that employee 33071 received the PIP after two additional policy violations that occurred in March 2008, but Earl's citation to the record does not clearly establish that assertion.

33071 was 37 years old when she violated the address verification policy.

Employee 36082 incorrectly collected child demographics from three separate homes that he recruited and signed between March and December 2005. Because Nielsen regards data received from a household with incorrect demographics as "corrupted," the company had to remove its monitoring device from the second home that had been improperly signed. After this second violation, employee 36082 received a "final warning" that he would face possible termination if the company discovered another similar violation. Nielsen discovered yet another violation two weeks later, the recruiter's third in nine months. Despite the previous warning, Nielsen issued the employee a PIP but did not terminate him. Employee 36082 was 39 years old at the time of the first violation; he was 40 at the time of the second and third violations.

Employee 46432 signed a home with the wrong demographics and entered inaccurate recruitment data into the company computer system in April 2006, during his first three weeks on the job. He received a DIP on April 27. On May 12, the employee's supervisor Annette Adams asked permission to terminate him. She reported that employee 46432 had been repeatedly late to appointments; had claimed overtime by posting 71 hours during a week when his trainer posted only 40 hours; had "trashed" his company car; and had claimed to have scheduled an appointment with a head-of-household but had not done so, with the result that when three Nielsen workers arrived the head-of-household was "livid." Adams reported these problems and many others before concluding: "This is just some of the issues we've had. There have been too many to list." Bob Burns, the head of Nielsen's human resources department, responded the same day: "As much as it sounds reasonable to terminate him without a PIP, it would not be consistent with our procedure. My recommendation is to place him on a Final Warning PIP immediately for all these

things, and the next time he fails to meet our expectations, terminate him." Nielsen issued the employee a PIP on May 22. Weeks later, the employee's performance had not improved, despite the PIP. Nielsen terminated him on June 21. Employee 46432 was 42 years old.

**[4]** This evidence raises a triable issue of pretext. The company maintains that it fired Earl for her address verification mistake and previous history of policy violations. However, Earl has presented specific and substantial evidence that Nielsen did not terminate significantly younger recruiters with similar histories of multiple policy violations. Viewing the evidence in the light most favorable to Earl, we conclude that reasonable jurors could find that Nielsen's proffered reason is a pretext for age discrimination.

The district court granted summary judgment despite the above evidence on the grounds that (a) the other recruiters were not similarly situated to Earl because they did not commit the same violation, and (b) younger employees over the age of 40 were within the same protected class as Earl and thus did not provide appropriate comparisons for purposes of establishing pretext. We take the two grounds in turn.

### a.    Similar Violations

**[5]** Other employees are similarly situated to the plaintiff when they "have similar jobs and display similar conduct." *Vasquez*, 349 F.3d at 641. The employees need not be identical, but must be similar in material respects. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010). Materiality depends on the context and is a question of fact that "cannot be mechanically resolved." *Id.* at 1157-58. The Seventh Circuit has noted that it is "important not to lose sight of the common-sense aspect" of the similarly situated inquiry. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). "It is not an unyielding, inflexible requirement that requires   near   one-to-one   mapping   between   employees"

because one can always find distinctions in "performance histories or the nature of the alleged transgressions." *Id.*

Earl and all of the employees described above were Nielsen recruiters and thus had to follow the same policies and procedures. Nielsen officials oversee discipline of recruiters on a national level in an effort to ensure they are subject to consistent standards. Nielsen relies on case law from other circuits to argue that only recruiters with the same immediate supervisor should qualify as similarly situated to Earl. However, we recently held to the contrary. *Hawn*, 615 F.3d at 1157 ("It was error for the district court to impose a strict 'same supervisor' requirement.").

**[6]** Earl and the other recruiters violated similar company policies. The district court required an exact match between Earl's violation and those of the other recruiters. It noted that Earl recorded an incorrect household address, whereas the other recruiters signed homes that did not meet Nielsen's specified demographics. This distinction between the violations is immaterial for several reasons.

**[7]** First, the distinction overlooks the fact that employee 33071 failed to verify the address of a home she recruited in December 2006, just two months after Earl made the same mistake. Employee 33071 already had two previous DIPs for other performance issues. When Earl made her mistake she had only one DIP. Nielsen terminated Earl for her failure to verify an address, but employee 33071 either received a PIP or suffered no disciplinary consequence at all.

**[8]** Second, Nielsen itself identified the other recruiters' violations as similar to Earl's. The company produced evidence of these violations in response to Earl's discovery request for information about other recruiters whom the company disciplined for "violating the same company policies and procedures." In complying with the discovery request, Nielsen's human resources manager emailed other officials in

search of instances where the company disciplined or terminated employees for "signing the wrong household." Company officials described the address verification violation by employee 33071 as "sign[ing] the wrong home." Nielsen now argues that "signing the wrong home" by other recruiters is an inappropriate comparison to "enrolling the wrong household for equipment installation" by Earl. We fail to see any material difference between the two violations.

**[9]** Third, the relevant Nielsen policies and procedures all serve the same purpose. Nielsen lists the polices in its written recruiting procedures. All of them concern the proper collection and verification of household information in order to ensure accurate data. Although Nielsen can point to variations in the violations committed by Earl and the other recruiters, the violations are more alike than performance issues we have recognized as similar in other employment discrimination cases. *See, e.g., Nicholson v. Hyannis Air Servs., Inc.* 580 F.3d 1116, 1125-26 (9th Cir. 2009) (holding that a female pilot with poor communication and cooperation skills was similarly situated to male pilots with deficient technical piloting skills because the company could address both issues through retraining).

**[10]** Fourth, the policy violations at issue are of "comparable seriousness." *See McDonnell Douglas*, 411 U.S. at 804; *Vasquez*, 349 F.3d at 641 (finding that an employee was not similarly situated where he "did not engage in problematic conduct of comparable seriousness" to the plaintiff's). The purpose of the address verification policy violated by Earl is to prevent the collection of corrupted data. However, Nielsen officials also said they were "very concerned" about the integrity of the data produced by employee 46432 and described him as presenting "clearly a serious problem." The company had to remove the monitoring device at a home signed by employee 36082 with incorrect demographic information because of potentially corrupted data. In an internal memorandum sent to another employee, Nielsen wrote, "Removing a

home from the sample due to a demo-mismatch is a very serious matter. If this is repeated, disciplinary action up to and including separation may occur." Earl's violation could have resulted in the collection of corrupted data or required removal of the monitoring device, but in fact it did not. Earl has thus presented evidence that the younger recruiters' policy violations were at least of "comparable seriousness" to her own. Indeed, viewed in the light most favorable to her, their violations were more serious.

**[11]** Finally, whether the other recruiters are similarly situated to Earl is a question of fact. *Hawn*, 615 F.3d at 1158; *Beck v. United Food & Commercial Workers Union Local 99*, 506 F.3d 874, 885 n.5 (9th Cir. 2007) ("We agree with our sister circuits that whether two employees are similarly situated is ordinarily a question of fact."). Viewing the evidence in the light most favorable to Earl, we conclude that Earl has presented a triable issue that the other recruiters and their violations are sufficiently similar to hers to merit comparison.

### b.   Significantly Younger Recruiters

The district court concluded that because employee 36082 turned 40 during the relevant time period, and thus came within the protected class under FEHA, Nielsen's failure to terminate him "refutes rather than supports" Earl's claim of age discrimination. Further, Nielsen notes on appeal that employee 46432 was 42 when he committed the policy violations and "therefore cannot be a proper comparator as a matter of law."

**[12]** In an age discrimination case, comparison with younger employees within the protected class is not improper as a matter of law. Rigid insistence that a comparator be a member of the protected class overlooks a key difference between age and other forms of discrimination. Whereas sex and race discrimination rely on an individual's membership in a particular class, age discrimination is relative. The proper inquiry is not

whether the other recruiters are outside the protected class, but whether they are significantly younger than Earl. As the Supreme Court explained in *O'Connor v. Consolidated Coin Caterers Corp.*, the federal Age Discrimination in Employment Act (ADEA) "does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age." 517 U.S. 308, 312 (1996). The Court wrote, "there can be no greater inference of *age* discrimination . . . when a 40-year-old is replaced by a 39-year-old than when a 56-year-old is replaced by a 40-year-old." *Id.* "[T]he fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *Id.* at 313; *see also Begnal v. Canfield & Assocs., Inc.*, 78 Cal. App. 4th 66, 73 (2000) (citing federal and California cases that a plaintiff may establish a prima facie case of age discrimination by submitting evidence of replacement by a substantially younger person).

In *O'Connor*, the Supreme Court addressed age discrimination at the first step of the *McDonnell Douglas* framework, where a prima facie case is at issue, rather than at the third step, where pretext is at issue. But neither Nielsen nor the district court offered any reason why the logic of *O'Connor* should not apply with equal force to pretext. Both relied on a sex discrimination case, *Beck v. United Food & Commercial Workers Union Local 99*, 506 F.3d 874, 883 (9th Cir. 2007), rather than an age discrimination case for their conclusion that a similarly situated employee must be outside the protected class for the purposes of pretext.

**[13]** Earl was 59 years old when she was terminated. She compares her treatment to other Nielsen recruiters between the ages of 36 and 42. The district court recognized that Earl's temporary replacement by a 42-year-old could establish a prima facie case of age discrimination because the other recruiter was "significantly" younger. Applying the same

logic, Earl can also show evidence of pretext by comparing her treatment to significantly younger recruiters, even if they are not within the protected class.

## 2. Deviation from Company Procedure

**[14]** A plaintiff may also raise a triable issue of pretext through evidence that an employer's deviation from established policy or practice worked to her disadvantage. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1214 (9th Cir. 2008)*; see also Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982) (finding employer's departure from internal procedures probative evidence of pretext). Earl was terminated after receiving a single DIP. She never received a PIP, a much more serious warning. Earl has presented evidence that in terminating her without first issuing a PIP, Nielsen deviated from its normal internal disciplinary procedure. In May 2006, Nielsen did not terminate employee 46432, a younger recruiter, even though he had extremely serious performance issues, because he had received only a DIP. In an email exchange with other company officials, Bob Burns wrote: "As much as it sounds reasonable to terminate him without a PIP, it would not be consistent with our procedure." Employee 46432 was eventually terminated, but only after issuance of a PIP.

Nielsen contends that the Burns email does not correctly recite company policy. It points to its written disciplinary policy which does not refer to PIPs, describes its employees as "at will," and expressly states that the company may accelerate the disciplinary process "up to and including termination in any case." Human Resources Manager Jim Sowatzke testified in a deposition that although Burns's interpretation of company policy would be "definitive" he did not understand Burns's email to be stating a matter of policy. However, Sowatzke also testified that a PIP is part of the company's formal disciplinary process.

**[15]** In a later email to another Nielsen official, Burns explained that he recommended a pre-termination PIP for employee 46432 so the company "can demonstrate that we treated him no differently than we have anyone else." Burns said he "assumed that [employee 46432] is a protected class individual, and so consistency is of utmost importance." Earl has raised a triable issue why consistency was not of similar importance when Nielsen terminated her — another "protected class" employee — seven months later. Viewing this evidence in the light most favorable to Earl, we conclude that Earl has raised a genuine dispute whether issuing a PIP prior to a termination constitutes an internal company practice or procedure.

**[16]** Even if issuance of a pre-termination PIP was not Nielsen's formal policy, the above evidence is also relevant to show that Nielsen applied a more forgiving disciplinary process for younger recruiters who were similarly situated to Earl. We note, in particular, employee 46432 who "failed to meet virtually every aspect of his job requirements" during his first several weeks as a recruiter, but whom Nielsen refused to terminate without first issuing a PIP. A few months after employee 46432 was terminated, Nielsen terminated Earl even though she had been issued only one DIP in her more than a dozen years with the company and had never received a PIP. We conclude that the more lenient disciplinary process Nielsen used for younger recruiters thus raises a triable issue of pretext, regardless of the company's formal policy or practice.

## B.   Disability Discrimination

Earl did not present any disability discrimination arguments in either her opening or reply brief and has waived any appeal of the district court's decision on that claim. *Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983, 994-95 (9th Cir. 2009); *Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("Particularly on appeal, we have

held firm against considering arguments that are not briefed."). We therefore affirm the district court's grant of summary judgment on Earl's disability discrimination claim.

## C.   Wrongful Termination

**[17]** Because Earl's age discrimination claim under FEHA survives summary judgment, so too does her claim for wrongful termination in violation of public policy. *See Stevenson v. Superior Court*, 16 Cal. 4th 880, 897 (1997).

## Conclusion

We agree with the district court that Earl's multiple violations of company policy could constitute a legitimate reason for terminating her employment. However, Earl has provided specific and substantial evidence that significantly younger recruiters who repeatedly violated similar policies received more lenient treatment from the company. She has thereby raised a triable issue that Nielsen's proffered reason was pretext for age discrimination.

We REVERSE the district court's grant of summary judgment against Earl's age discrimination and wrongful termination claims, AFFIRM the grant of summary judgment against her disability discrimination claim, and REMAND for further proceedings consistent with this opinion.

**REVERSED** in part, **AFFIRMED** in part, and **REMANDED**.